Filed 7/7/23  P. v. Moore CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E078602 |
| v. | (Super.Ct.No. FSB033089) |
| DAYMON ZACHARY MOORE, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Gregory S. Tavill, Judge.  Affirmed.

Heather L. Beugen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Daymon Zachary Moore appeals from the trial court's order denying his petition for resentencing under Penal Code[1] section 1170.95 (now section 1172.6[2]).  For the reasons set forth *post*, we affirm the court's order.

## FACTUAL AND PROCEDURAL HISTORY

A.     PROCEDURAL HISTORY

In 2004, a jury convicted defendant of murder under section 187, subdivision (a); burglary of an inhabited dwelling under sections 459 and 462, subdivision (a); and attempted second-degree robbery under sections 211 and 664.  (*People v. Moore* (Aug. 18, 2006, E039142) [nonpub. opn.], at p.1 (*Moore I*); *People v. Moore* (Aug. 26, 2021, E073461 [nonpub. opn], at p. 2 (*Moore II*).)[3]  The trial court sentenced defendant to an indeterminate term of 25 years to life for the murder, and to concurrent terms of four and two years, respectively, on the two other counts.

On January 9, 2019, defendant filed a petition for resentencing seeking to vacate his murder conviction under section 1172.6.  (*Moore II*, *supra*, at p. 3.)

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

[2]  While this appeal was pending, the Legislature amended and renumbered section 1170.95 as section 1172.6.  (Stats. 2022, ch. 58, § 10.)  We refer to section 1172.6 in this opinion, even though 1170.95 was the operative designation at the time of the underlying proceedings.

[3]  On November 22, 2022, this court granted the People's request for judicial notice filed on October 28, 2022.  In the order, this court took "JUDICIAL NOTICE of the records in appellant's prior appeals, case Nos. E038142 and E073461, including the opinions from each case."

On February 5, 2019, the People filed a motion to strike defendant's petition for resentencing. In the motion, the People argued that section 1172.6 is unconstitutional.[4] On March 7, 2019, defendant filed an opposition to the People's motion to strike the petition.

At the March 29, 2019, hearing on defendant's petition, the "court tentatively ruled that it did not need to reach the constitutional question because defendant had failed to state a prima facie case for relief. Defendant requested a continuance to obtain the reporter's transcripts of the jury trial; the court granted defendant's request." (*Moore II*, *supra*, at pp. 2-3}

At the continued hearing on August 16, 2019, the prosecutor and defense counsel were present; defendant was in custody and not present at the hearing. After arguments from both defense counsel and the prosecutor, "Defendant's petition pursuant to PC[1172.6] [was] denied/stricken." The court "found that defendant was ineligible for resentencing because he: (1) intended to kill the victim; (2) was a major participant as an aider and abettor to the underlying felonies; and (3) may have been the actual shooter." (*Moore II*, *supra*, at p. 3.)

On August 26, 2021—after defendant appealed the trial court's ruling—this court reversed the trial court's order denying defendant's petition. We remanded the case with

---

[4] We need not address the constitutionality of section 1172.6 because it is not an issue on appeal. However, we note that courts of appeal in California have consistently rejected constitutional challenges to Senate Bill No. 1437 (SB 1437). (See *People v. Marquez* (2020) 56 Cal.App.5th 40, 44, 46-51; *People v. Lombardo* (2020) 54 Cal.App.5th 553, 555; and *People v. Superior Court (Dominguez)* (2019) 42 Cal.App.5th 270, 276, 289.)

instructions to issue an order to show cause and to hold an evidentiary hearing. (*Moore II*, *supra*, at pp. 13-19}

On February 25, 2022, on remand and following an evidentiary hearing, the trial court denied defendant's resentencing petition. The court also signed and filed its "Order on Petition for Resentencing." In its order, the court found that defendant had aided and abetted the murder with intent to kill. "By his conduct that included the words spoken, the Defendant, with an intent to kill, aided and abetted the first degree murder of [the victim]. This Court finds by proof beyond a reasonable doubt that Defendant Daymon Zachary Moore is guilty of first degree murder."

On May 2, 2022, defendant filed a timely notice of appeal.

B.      FACTUAL HISTORY[5]

"Keshia Bennett lived in apartment 26 of a complex at 16th and Arrowhead in San Bernardino, an upstairs unit. The morning of December 28, 2001, Bennett and another resident, Joel Torres, saw defendant at the complex wearing white pants, a black leather jacket, black boots, and a white visor.

"About 1:00 p.m. that day, Vernetta Rollins, a friend of Bennett's, was in apartment 26 while Bennett was out. At some point, [the victim] came through the door of the apartment. He looked scared and told Rollins to call the police. Rollins went to the bedroom and called the police. While still in the bedroom, she heard three voices from the living room, including [the victim]'s. After that, she heard about five gunshots.

---

[5] The facts are taken from the unpublished opinion in *Moore I*, case No. E038142.

4

Torres, downstairs, heard 'four pops.' He looked out his window and saw two men, one of whom Torres was 'pretty sure' was defendant. That man was wearing white pants and a black leather jacket and was tucking a handgun in the back of his pants.

"An autopsy revealed [the victim] died of gunshot wounds to the chest and abdomen."

"Detective Carr interviewed defendant twice at the police station after the shooting. The interviews were videotaped, and the tapes and transcripts of them were introduced at trial."

"The police arrested defendant on the evening of the shooting. About 10:50 that evening, Detective Carr interviewed defendant after defendant waived his Miranda rights. Defendant was wearing a tan shirt and blue pants or jeans.

"Defendant denied being at the apartment complex on the day of the shooting. He said that about 12:00 or 1:00 p.m. on that day, he was at a house across the street from the complex, visiting with his friend Meetchie and some other people. Between 12:00 and 1:00, defendant borrowed a car and gave two women, Keisha and Mubby, a ride to a pawnshop, where Keisha pawned a stereo. He drove back to Meetchie's house and, after awhile, called his brother Shane to pick him up. He spent the rest of the day and evening at his mother's house, where he was living.

"Carr told defendant he was going to investigate his story, and it was 'gonna start falling apart.' He said he had physical evidence proving defendant had been in Bennett's apartment. Carr suggested defendant had gone into the apartment 'with the wrong

5

person,' not knowing the shooting was going to happen, and 'got kind of sucked into' the crime. The interview ended shortly after midnight.

"Later that day, Carr went to the pawnshop to which defendant had referred. No one named Keisha had made a pawn on the day of the shooting. Carr also went to the apartments at which defendant had said Keisha and Mubby lived. No one there knew anyone named Keisha or Mubby."

"About 6:15 p.m. the same day, Carr interviewed defendant again for about two hours. After again reading defendant his Miranda rights, Carr told defendant he had gone to the pawnshop, and defendant's story had not checked out. He also told defendant his palm prints were on the inside of the door to apartment 26 and on a glass table inside the apartment. Carr said defendant was 'fucked' unless he came up with a reason why he was in the apartment.

"Defendant then said, 'It was a robbery.' He said that just before the shooting, a man he did not know approached him on the street next to the complex. The man asked defendant if he wanted to make some money. He said the intended victim sold drugs and had a lot of money. He told defendant, '[J]ust follow me,' so defendant followed him.

"The intended victim took off running, so they chased him into apartment 26, and defendant pushed the door in. The other man produced a gun and told the victim to give him his money and car keys. The victim tried to grab the gun, and the man shot him. Defendant took off.

"After the interview ended, Carr asked defendant what he was wearing at the time of the incident. Defendant said he was wearing white pants and a black jacket."

6

"Defendant testified that after he woke up on the morning of December 28, 2001, he went to an appointment with his probation officer. After that, he went to Meetchie's house. After defendant finished visiting, he walked across the street to the apartment complex. He went to apartment 29 and visited Andrew, a man he knew from his former employment. Defendant was wearing blue jeans, a white T-shirt, and a tan shirt. He did not tell Carr that he had been wearing a black jacket and white pants that day.

"After visiting apartment 29, defendant took Keisha and Mubby to the pawnshop. Then he dropped Mubby off at her home and drove to his girlfriend's house. His girlfriend, Andrea, called his mother, and she came and picked defendant up. They went to the grocery store and then home. Defendant did not leave the house after that except to walk his dog that evening.

"Defendant further testified that after he was arrested, he was given nothing to eat or drink. He slept on a cold cement slab with no blanket. He drank some water from a sink in the cell and threw up.

"When Carr interviewed him the second time, defendant testified, he was tired. He also was scared because Carr kept cussing at him. He falsely told Carr he had been involved in the shooting because he was afraid the police were going to hurt him or beat him, or something like that. He thought that if he told Carr what he wanted to hear, Carr probably would let him go home. The details he told Carr about the shooting included some facts he learned from his brother Kenny, some he learned from Carr himself, and others he just made up.

7

"[D]efendant's mother, testified that she picked defendant up at his girlfriend's house between 12:45 and 12:50 p.m. on December 28, 2001. Defendant was wearing brown khaki pants, a white T-shirt, and a brown and white checkered shirt. She stopped at a Stater Brothers grocery store at Baseline and Waterman and then drove home, arriving sometime after 1:30. Defendant did not leave the house until the police arrested him that night.

"Debra Caro was formerly involved with defendant's brother and had guardianship of his four children. Caro also was a good friend of [defendant's mother]. She testified that on December 28, 2001, she let [defendant's mother] use her car to go to the store. She brought the car to [defendant's mother]'s house, and [defendant's mother] left the house in the car about 12:10 or 12:15 p.m.

"[Defendant's mother] returned at about 1:25 or 1:30 p.m. with bags of groceries from Stater Brothers. Defendant was in the car with her. Defendant was wearing white pants and had no shirt on. He was 'all sweaty.'

"Edgar Samayoa lived in apartment 24 of the complex at the time of the shooting. About 1:00 p.m., he saw a man who appeared to be [the victim] being chased by two black males, one wearing a black jacket and probably a visor. Samayoa did not recognize defendant as either of the men who chased [the victim]."

"Carr testified that he talked to [defendant's mother] when defendant was arrested on the evening of the shooting. She was unable to account for defendant between 12:00 and 1:30 p.m. that day.

8

"An officer interviewed Mr. Samayoa an hour or two after the shooting. Samayoa said one of the men who pursued [the victim] was wearing a black jacket and white pants and had a light-colored visor.

"The shooting location, [defendant's mother]'s house, defendant's girlfriend's house, and the Stater Brothers at Baseline and Waterman were all within a radius of no more than 10 miles.

"On October 3, 2003, defendant called [his mother] from jail. The call was recorded. Defendant said the trial was 'not going good' because of 'what I said.' Defendant said, '[T]hey just know I was involved with it,' but they were not accusing him of killing [the victim]. 'They know I didn't do it, but I was there.' "

## DISCUSSION

### A. THE TRIAL COURT PROPERLY FOUND DEFENDANT INELIGIBLE FOR RELIEF UNDER SECTION 1172.6

On appeal, defendant contends that "the trial court's determination that appellant was ineligible for resentencing because he was a direct aider and abettor who acted with the specific intent to kill, is based on speculation and conjecture, and not substantial evidence." Therefore, defendant argues that this "court should reverse this case again with directions for the trial court to grant the petition, for lack of substantial evidence." For the reasons set forth *post*, we affirm the court's denial of defendant's petition.

#### 1. *LEGAL BACKGROUND*

SB 1437 became effective January 1, 2019. "[SB 1437] modified California's felony murder rule and natural and probable consequences doctrine to ensure murder

9

liability is not imposed on someone unless they were the actual killer, acted with the intent to kill, or acted as a major participant in the underlying felony and with reckless indifference to human life." (*People v. Cervantes* (2020) 46 Cal.App.5th 213, 220.) As relevant here, SB 1437 added section 189, subdivision (e), which provides, "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).) Section 190.2, subdivision (d) provides, "Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4."

SB 1437 also created a process through which convicted persons can seek resentencing if they could no longer be convicted under the reformed homicide law. (§ 1172.6, subd. (a).) Section 1172.6, subdivision (a), provides in part, "A person

10

convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime*, attempted murder under the natural and probable consequences doctrine*, or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts."  (Italics added.)

Section 1172.6, subdivision (c), provides, "Within 60 days after service of a petition . . . , the prosecutor shall file and serve a response.  The petitioner may file and serve a reply within 30 days after the prosecutor's response is served.  These deadlines shall be extended for good cause.  After the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief.  If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause.  If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so."  If the petitioner makes a prima facie showing he is eligible for relief under section 1172.6, the court shall hold an evidentiary hearing.  (§ 1172.6, subds. (c) & (d)(1).)  At this hearing, either party may present new evidence and the prosecution bears the burden of proving the petitioner could still be convicted beyond a reasonable doubt.  (§ 1172.6, subd. (d)(3).)

Effective January 1, 2022, Senate Bill No. 775 amended former section 1170.95 to expand its scope to those convicted of  "attempted murder under the natural and probable consequences doctrine."  (§ 1172.6, subd. (a).)

11

In *People v. Clements* (2022) 75 Cal.App.5th 276, 294, 298, this court held that an appellate court reviews a trial court's finding that a petitioner is ineligible for resentencing at the conclusion of an evidentiary hearing for substantial evidence. "We review the trial judge's factfinding for substantial evidence. [Citation.] We ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Id.* at p. 298.)

2. *THE COURT'S RULING IS SUPPORTED BY SUBSTANTIAL EVIDENCE*

In this case, defendant contends the court's ruling "can only be based on speculation, not substantial evidence." As will be discussed *post*, we disagree with defendant and find that substantial evidence supports the trial court's findings.

To support his argument, defendant contends that the trial court improperly relied on evidence that Rollins heard defendant say "shoot him," or "kill him," because it was based on speculation. Defendant states, "[i]t is true that Rollins testified to hearing three men in the living room while she was hiding in the bedroom with the door closed, one of

12

whom sounded like the victim[.]  [Citation.]  It is also true that she testified that she heard two other mens' [*sic*] voices say other things, one younger-sounding voice and one older-sounding voice.  [Citation.]  She testified that she heard [the victim] say 'Don't kill me, and also that one of the men said 'shoot him, kill him' a few times and the other man asked for a pillow.  [Citation.]  The problem with this testimony, of course, is that there was absolutely no evidence that [defendant] was the person who said, kill him, or shoot him."

We agree with the People that defendant "does not challenge the underlying facts as established by the trial transcripts and the exhibits, and as recounted by the trial court; instead he challenges the trial court's interpretation of those facts."

Contrary to defendant's assessment of the trial testimony, the evidence amply supports the trial court's finding that defendant aided and betted the murder with an intent to kill.

First, it is undisputed that defendant was at the scene of the murder.  Defendant was seen at the apartment complex before and after the murder, and defendant admitted that he was at the scene of the murder to the interviewing detective and to his mother.

Moreover, there is no question that there were only three men involved in the murder—the victim, defendant, and a third individual.  Rollins testified that she only heard three voices.  Defendant confirmed Rollins's testimony because defendant told a detective that there were only three men involved—the victim, an unidentified male, and defendant.

13

Additionally, according to Rollins, the man who said, "Just kill him" was a different individual than the person who said, "Give me a pillow," just prior to shooting the victim. We note that Rollins could not identify the two voices, and there is nothing in the record that voice identification methods were employed in an effort to identify the voices.

However, if defendant were not the shooter, as defendant claims, the only reasonable conclusion would be that defendant was the person who said, "Just kill him," since two different individuals said the two phrases. Therefore, by encouraging the actual shooter to kill the victim, defendant directly aided and abetted the murder, as the trial court found.

In its order, the trial court quoted excerpts from the reporter's transcript of the trial wherein Rollins gave her testimony regarding the three voices she heard. The trial court also went over defendant's statement talking about the three men present. The court noted that defendant "corroborated Rollins's testimony when he told the detective that the other perpetrator said 'Give me a pillow' [citation] during the incident. [And,] [t]he person that said 'Give me a pillow' was not the same as the person that said 'Shoot him, kill him.' If the Defendant was not the person that said 'Give me a pillow,' then he had to have been the one that told the killer to 'Shoot him, kill him.' " In a footnote of the order, the court also noted that at a hearing, "there was some discussion that the Defendant had to be either 1) the actual killer or 2) an actual and direct aider and abettor because he spoke the words 'Shoot him, kill him.' Either way, the Defendant is guilty of murder. The evidence does not allow for any alternative conclusion."

14

Before making its ruling, the court went into further detail regarding its finding that defendant acted with an intent to kill:

"The issue presented by the petition is whether the evidence proves beyond a reasonable doubt that Defendant was 'the actual killer' [citation], or 'was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree' [citation], or 'was a major participant in the underlying felony and acted with reckless indifference to human life' [citation]. The evidence proves that the Defendant was the person that spoke the words, 'Shoot him, kill him' to Defendant's co-part in crime—the actual killer. The intent to kill is inherent in the words spoken. By his conduct that included the words spoken, the Defendant, with an intent to kill, aided and abetted the first degree murder of [the victim]."

The court then went on to find "by proof beyond a reasonable doubt that Defendant . . . is guilty of first degree murder" and denied defendant's petition for resentencing.

After examining the record in the light most favorable to the trial court's order, we find that there is reasonable, credible and solid evidence to support the trial court's finding that defendant, with an intent to kill, aided and abetted the first degree murder of the victim. Again, we note that although "the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's

15

findings beyond a reasonable doubt." (*People v. Clements*, *supra*, 75 Cal.App.5th at p. 298.)  Here, based on the above, we find that the court's finding is supported by substantial evidence.

Therefore, the trial court properly denied defendant's petition for resentencing.

## DISPOSITION

The order denying defendant's petition is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER\
J.

We concur:

RAMIREZ\
P. J.

RAPHAEL\
J.